MAIMONIDES SCHOOL & others[1] *vs.* HARRIS COLES[2]
& others.[3]

No. 06-P-1304.

Middlesex. April 9, 2007. -- February 25, 2008.

Present: GELINAS, COHEN, & SIKORA, JJ.

*Trust,* Amendment and modification, Settlor. *Will,* Testamentary capacity,
Undue influence. *Undue Influence. Devise and Legacy,* "Pour-over,"
Charitable trust.

In an action seeking a declaration that a certain amendment to the decedent's
trust was invalid, the probate judge considering the parties' motions for
summary judgment properly applied the standard for testamentary capacity
and not the more demanding test for contractual capacity in evaluating the
decedent's competence to execute that amendment, because the trust instru-
ments were not complex, and because the decedent's pour-over will and
the relevant trust amendment comprised parts of an interrelated whole, to
which application of two different standards would unnecessarily and im-
practically risk inconsistent results. [251-252]
A probate judge properly granted summary judgment in favor of the proponents
of a contested trust amendment, where the contestants' irrelevant and base-
less evidence — consisting of two affidavits from doctors, one of whom
had never met the decedent — was insufficient to defeat the presumption
that the decedent had the requisite mental capacity to execute the amend-
ment to his trust [252-255], and where the contestants did not produce
evidence that created a genuine issue of fact whether the decedent's disposi-
tion of property was unnatural or whether the relatives who benefited from

[1]The Carroll Center for the Blind, the Perkins School for the Blind, and
Beth Israel Deaconess Medical Center, Inc. Separate counsel represents Beth
Israel Deaconess Medical Center. It presents essentially the same issues and
arguments as the three other plaintiff-appellants. We will refer to all plaintiffs
collectively as the "contestants."

[2]As trustee of the Leonard R. Brener Revocable Trust, as amended; as
executor of the estate of Leonard R. Brener; and individually.

[3]Gail Bond, Paul Bond, George Brener, Robert Brener, Gail Sullivan Calla-
han, Elinor Coles, Barbara Kardon, Elliot Katz, Jesse M. Putney, Linda Samp-
son, and Arlene Swan individually; and Herbert Rosen and Lois Rosen, individu-
ally and as trustees of the Sophia A. Bond Family Trust II. Separate counsel
represent Harris Coles. Coles has independently presented essentially the same
arguments as the other defendant-appellees. We will refer to all defendants as
the "proponents."

the amendment engaged in improper conduct to achieve it such as would constitute undue influence [255-257].

COMPLAINT filed in the Middlesex Division of the Probate and Family Court Department on November 21, 2002.

The case was heard by *Edward F. Donnelly, Jr.*, J., on a motion for summary judgment.

*Stephen G. Howard* for Maimonides School & others.

*Gregory J. Aceto* for Beth Israel Deaconess Medical Center, Inc.

*C. Peter R. Gossels* for Herbert Rosen & others.

*Jordana B. Glasgow* for Harris Coles.

SIKORA, J. After an eleven-month struggle with esophageal cancer, Leonard R. Brener died on December 8, 2001, at age eighty-five. He had never married. He had no children. He had conducted a long and successful career as a stockbroker. The value of his estate approximated $8 million. Several nieces and nephews survived him.

In October, 2001, about five weeks before his death, he had amended for a second time the testamentary pour-over trust through which he was transmitting the bulk of his estate. Before the October amendment, the terms of the trust, under an earlier amendment executed in March of 2001, designated four charitable institutions as the recipients of the residue of the estate: thirty percent was to pass to the Maimonides School; another thirty percent to the Perkins School for the Blind; ten percent to the Carroll Center for the Blind; and thirty percent to the Beth Israel Deaconess Medical Center.

The October amendment drastically altered the disposition. It designated Brener's niece, Lois Rosen, and her husband, Herbert Rosen, as the sole recipients of the entire residue.

The four charitable institutions (the contestants) brought the present action in the Probate and Family Court for a declaratory judgment invalidating the October trust amendment. As grounds they alleged Brener's lack of mental capacity and his submission to undue influence at the time of the amendment. They named as the primary defendants the trustee, Harris Coles, and Lois and Herbert Rosen (the proponents).

At the conclusion of discovery, the proponents and the contestants presented cross motions for summary judgment. After consideration of extensive factual materials, thorough briefing, and oral argument, a judge of the Probate and Family Court, in a well-reasoned decision, denied the contestants' motion, allowed the proponents' motion, and entered a summary judgment of dismissal of the claims of the charitable institutions. That judgment has the effect of an affirmative declaratory judgment validating the second trust amendment. We affirm the judgment.

*Background.* The issues of mental incapacity and undue influence require a detailed factual account. See, e.g., *O'Rourke* v. *Hunter*, 446 Mass. 814, 822-826 (2006). The following information emerges from the summary judgment materials as uncontested. We reserve some details for the application of the governing legal doctrines.

1. *The 1997 arrangements.* On September 19, 1997, Brener executed a will (the pour-over will) and a revocable inter vivos trust. Attorney Jackson W. Wright, Jr., of the law firm of Palmer & Dodge, LLP, prepared the instruments. Brener was the original trustee. He designated Harris Coles as executor and as first successor trustee. Coles had been a personal friend and Brener's accountant for more than thirty years. The second successor trustee and executor was his friend Jesse Putney. Brener appointed David Shaw as third successor executor and trustee. Shaw was an attorney and a distant relative. Under the terms of the trust, Brener made a testamentary gift of $50,000 to his niece, Lois Rosen; and four smaller gifts, respectively: $10,000 to a nephew; $25,000 to Jesse Putney; $15,000 to Harris Coles; and $15,000 to Coles's wife, Elinor. He directed the trustee to distribute the remaining trust property to "organizations then qualifying for the federal estate tax charitable deduction," as later designated by him or a successor trustee.

Brener directed the trustee to carry out the provisions of an agreement with Maimonides School (capital gift agreement), which he had executed on August 12, 1997. The capital gift agreement memorialized Brener's commitment to contribute $2,750,000 to the school ($750,000 during his life and $2,000,000 upon his death) and the school's commitment to let Brener name its new building. Maimonides School had initially

proposed that it receive also the residue of Brener's estate. Brener had rejected this request. Instead, the capital gift agreement provided that Maimonides School would not enforce the agreement to the extent that Brener's estate needed funds to pay bequests to his friends and family.

On various occasions, Coles and Attorney Shaw advised Brener that his estate could deduct donations to charities. Brener appeared to understand these instructions. He had substantial experience in financial matters. He had worked as a stockbroker from the late 1950's onward.

2. *The diagnosis.* Brener received the diagnosis of esophageal cancer in January or February of 2001. The medical records from this time period state that he became clinically depressed, felt helpless, and expressed thoughts of suicide. They also describe Brener as "[a]lert, oriented, lucid, coherent," and "[i]ndependent, . . . [with] [n]o evidence of psychotic thinking." His suicidal ideation appeared to be "a function of his clinical depression."

3. *The involvement of the Rosens.* Niece Lois Rosen and her husband Herbert had maintained a close relationship with Brener for many years. Lois had known him throughout her life. Brener had served as Herbert's stockbroker and financial advisor since 1969. Brener had often visited the Rosens' home for holidays. The Rosens had regularly visited him in an assisted living residence and then helped him to move to a condominium unit in November of 2000.

After the diagnosis the Rosens drove him to doctors' appointments, to restaurants, and to visits with his friends and former clients. They brought him to visit their cottage on Cape Cod. On one occasion in late February of 2001, the Rosens visited Brener at his apartment. He was having difficulty swallowing. Herbert Rosen called Brener at three or four o'clock the next morning to check on him. Brener complained that he could not swallow. Herbert dressed, drove to Brener's apartment, and brought Brener to the emergency room at St. Elizabeth's Hospital. They continued to monitor his care throughout the remaining months of his life.

4. *The first amendment of the trust.* In February of 2001, Coles suggested that Brener select specific charities to receive

the residue of his estate, rather than delegate those choices to him as successor trustee. Attorney Wright prepared the first trust amendment, which Brener executed on March 14, 2001. Brener replaced the $50,000 cash gift to Lois Rosen with gifts of $25,000 to Lois Rosen and Herbert Rosen respectively. He left the cash gifts to Harris and Elinor Coles intact, and made small changes and additions to other gifts to friends and relatives. He specified the charities to receive the residue of the estate: thirty percent to Maimonides School, thirty percent to the Perkins School for the Blind, ten percent to the Carroll Center for the Blind, and thirty percent to Beth Israel Deaconess Medical Center. Coles had prepared Brener's income tax returns for the past thirty years. He stated in an affidavit that before executing the capital gift agreement and the trust in 1997, and the first trust amendment in 2001, Brener had made only nominal gifts to charitable organizations.

5. *Events of October of 2001.* On October 17, 2001, Brener was admitted to St. Elizabeth's Hospital after he had suffered a fall at home. He listed the Rosens as his emergency contact. On October 18, Lois Rosen observed that Brener was not using his left arm, that he could not squeeze her hand, and that the left side of his face was drooping. She reported these symptoms to the nurse. The medical records state that the incident was either a stroke or a transient ischemic attack (TIA), which typically resolves itself within a short period of time. Brener appeared to have recovered within days. Dr. Morse, a neurologist, observed during this period that Brener was "awake, alert[,] . . . [a]ble to tell me where he is, date, very joking, good naming, . . . memory recall." The St. Elizabeth progress notes from October 20 to October 23, 2001, state that Brener "improved significantly," that he was "alert" and "doing very well," and that he possessed a "clear mental status."

On October 25, 2001, Brener was admitted to Lasell House, a rehabilitation facility in Newton. Lois Rosen visited Brener every day and spoke to him frequently by telephone. The Rosens continued to follow his care. Lois advocated on behalf of Brener for better food and closer attention to his daily needs for exercise, therapy, and cleanliness. At times during visits the Rosens engaged in his care. When Brener became dissatisfied

with services at Lasell House, he asked the Rosens to arrange for his return to St. Elizabeth's Hospital.

On October 29 at Lasell House, Brener fell from his bed. He did not suffer an injury. The incident did generate a nurse's report later that day. It described Brener as alert, oriented, and able to communicate his needs. The fall had not affected his mental state.

6. *The circumstances and execution of the second trust amendment.* On October 30, 2001, Brener executed the second amendment to the trust and effectively substituted the Rosens for the four charitable institutions as the recipients of the residue of the estate. Accounts of that event come from Coles's affidavit and the deposition of Attorney Shaw. Coles stated in his affidavit that he had called Brener on the morning of October 29 to "catch up." Brener informed Coles that he had spoken with Attorney Shaw on October 28 and had asked Shaw to prepare a second trust amendment. He directed Coles to provide Attorney Shaw with the information necessary for the second amendment because Coles had custody of the trust documents. Later that day Coles received a telephone message from Shaw confirming Brener's request for a second amendment. Coles retrieved the trust documents from his office and, by phone conference with Brener, received and discussed specific changes. Brener told Coles that he had given Maimonides School "enough" and that he wanted to give the residue of his estate to the Rosens "for the love and affection that they had shown him and in appreciation of all of the attention and assistance that they had given him during his illness." After speaking with Brener, Coles spoke with Attorney Shaw and faxed him a marked up copy of the first trust amendment indicating the changes proposed by Brener.

The statements in Coles's affidavit about Brener's changing attitude toward Maimonides School received corroboration from another witness. Jesse Putney was a friend and coworker of Brener. He had visited Brener on September 12, 2001. In his answer to interrogatories, Putney stated that during that visit Brener had told him that "he wasn't happy about Maimonides and that they had had enough."

The October 29 visitor's log at Lasell House shows that

Coles visited Brener from 4:30 P.M. to 6:10 P.M.; that Lois Rosen visited him from 4:20 P.M. to 7:00 P.M.; and that Herbert Rosen stayed from 6:30 P.M. to 7:00 P.M. At deposition Lois recalled that her visit had overlapped with Coles's but that she had not witnessed any discussion of estate matters between her uncle and him.[4]

At deposition, Attorney Shaw first provided a somewhat different version of events preceding the execution of the second amendment. He stated that he had learned of Brener's wish to amend the trust from Coles's telephone message on October 29, and not from Brener the day before. After a break in the deposition, Attorney Shaw stated that he might have spoken with Brener on October 27 or 28.[5]

It is uncontested that Attorney Shaw called Brener in the afternoon of October 29 after he had finished drafting the second amendment based on the marked up copy of the first amendment received from Coles. He took Brener through the changes, and Brener confirmed them. In the late afternoon, Brener asked Coles to convey an additional request to Attorney Shaw to include a $10,000 gift to one of Brener's nephews. Shaw made that change.

---

[4] Q.: "Did you have the impression that Mr. Coles was there for a social visit?"

A.: "I didn't question why he was there."

Q.: "I am just asking your impression. You may not have questioned him. Was that your impression?"

A.: "Well, there was a moment when my uncle asked me if I would take a walk; that he had some business to discuss with Mr. Coles, and he wished to do it in private."

Q.: "And when did he ask you to do that?"

A.: "I don't remember. It was sometime."

Q.: "Was it during the visit we are focused on?"

A.: "Yes."

Q.: "Did you ask what the business was?"

A.: "No. It was not my place to ask."

Q.: "Did you ever find out what the business was?"

A.: "No. Never asked."

[5] The contestants submitted records of telephone calls from Brener's cellular telephone and from his room at Lasell House. Those records do not show a call placed to Attorney Shaw on October 28, 2001. The contestants subpoenaed Shaw's telephone records, but they did not come into evidence.

On the morning of October 30, Attorney Shaw went to Lasell House and again Shaw took Brener through the second amendment. Brener requested that Shaw add a gift of $2,000 to Gail Sullivan, a friend at his office. Brener executed the second amendment and initialed the changes in the margin. He named the Rosens the sole beneficiaries of the residue and removed the $15,000 cash gift to Coles's wife. Attorney Shaw testified that Brener knew "what he was doing," and "[d]idn't show any confusion."

During October and November, 2001, Brener made a series of alternative gifts to Maimonides School. On October 22 he instructed his office assistant to transfer to the school a share of stock valued at $32,735. On October 31, he named the school the beneficiary of annuities worth more than $200,000. On November 16 he made a cash donation of $95,621. On November 19, he instructed his assistant to sell 1,000 shares of stock and to credit $10,000 of the proceeds to the school.

The Rosens testified that, before Brener's death, they had not known that he had named them beneficiaries in the first and second amendments. They did not know of the amounts of his contributions to Maimonides School.

Attorney Shaw testified that, at the time of the second amendment, he believed that Brener would have a "substantial estate," but that he (Shaw) did not know the "dollar amount." Coles testified that he knew of Attorney Shaw but had never spoken with him before October 29, 2001. Brener had used Shaw's legal services before. In 2000, Shaw had represented Brener in the purchase of his condominium unit. He had created a trust for another niece of Brener. Shaw and Brener had attended various family events, including the wedding of Shaw's daughter in April of 2001.

The health workers at Lasell House, the Rosens, Coles, Attorney Shaw, and numerous family and friends who observed Brener between October 25 and November 2, 2001, described him as alert, oriented, lucid, mentally clear, with good memory, coherent and conversant. He readily recognized his family and friends.[6]

Until the later part of September, 2001, Brener had continued

---

[6]On October 28, 2001, a nurse wrote in her report that Brener was "alert and oriented, but depressed." He complained that he was not going to last

to visit his office at Morgan Stanley. On subsequent dates, including October 28 or 29, Brener had spoken with his office assistant regarding the status of his clients. His comments were coherent. He responded appropriately to questions and reports concerning the accounts of the clients.

7. *Opinion evidence offered by the contestants.* On November 2, 2001, Brener transferred from Lasell House to the transitional care unit of St. Elizabeth's Hospital. He returned home on November 28, but required readmission on December 1. He died on December 8, with the Rosens in attendance.

The contestants presented to the motion judge medical opinions of two physicians stating that Brener had lacked the requisite mental capacity to execute the second trust amendment. The first came from Dr. Charles Welch, a geriatric psychiatrist at Massachusetts General Hospital. His affidavit traced the course of Brener's medical records comprised of the diagnosis, the subsequent decline and deepening dependence on others, the swallowing difficulty, dehydration, significant weight loss, the falls, the October TIA, and the expressed willingness to die. Upon the basis of this information, Dr. Welch concluded that "Brener was without the ability to focus on and appreciate the nature and amount of his estate or the natural objects of his bounty," and that he "was very much subject to being unduly influenced by others." Doctor Welch proposed to expand upon this testimony at trial because "[t]he confines of a written [a]ffidavit do not permit amplification of all of the information . . . set forth in [the] medical records."

Doctor Bernard Kosowsky submitted his opinion by deposi-

---

long and should jump out of the window. During her deposition, a social worker testified that Brener had been mentally alert and not confused about the identity of his family members. Acknowledging that she had mentioned that Brener was confused, she explained that she had meant that Brener was a sick man moving from one setting to another with insufficient time to get used to his new surroundings and without the knowledge of next events. She spoke to Brener after he had made the statements about death and jumping out of the window and attributed the statements to depression.

On October 26, 2001, Brener told the attending physician that he wanted to be "full code," meaning that he wished to be resuscitated in the event the procedure was necessary to maintain, or bring him back to, life. There is no evidence that Brener ever attempted to commit suicide or that any physician or caretaker ever put him on any suicide watch.

tion testimony. He was chief of cardiology at St. Elizabeth's Hospital.[7] He had treated Brener since 1997 for "cardiac [related] issues." He was not Brener's primary care physician. He was Brener's attending physician at the hospital in October of 2001.

At his deposition, Dr. Kosowsky recapitulated Brener's medical records. He stated that Brener was "clearly disoriented and confused and weak" at the time of the TIA-related incident on October 18, 2001. After the incident, Brener had "improved considerably," "but remained weak." "There were times that [Brener] was more lucid than other[ times]." Doctor Kosowsky did not see or speak with Brener when he was at Lasell House from October 25 to November 2, 2001. He did not examine or request Brener's medical records from Lasell House.

After November 2, when Brener returned to St. Elizabeth's Hospital, Dr. Kosowsky had observed that Brener "had a lot of pain, a lot of weakness, periods of lucidity, periods of confusion and just sort of a gradual deterioration of his condition." He recalled that during November Brener had exhibited confusion on two occasions about the scheduling of events, one a trip outside the hospital and the other an in-house physical therapy session. Doctor Kosowsky concluded that on October 30, 2001, Brener had lacked the requisite mental capacity to execute the second trust amendment.

*Discussion.* 1. *Standard of review.* We examine the evidence in the light most favorable to the nonmoving party and "uphold an order granting summary judgment if the judge ruled on undisputed material facts and his ruling was correct as a matter of law." *O'Rourke* v. *Hunter,* 446 Mass. 814, 821 (2006). A proponent moving for summary judgment must "affirmatively demonstrate[] that the contestant[] ha[s] 'no reasonable expectation of proving an essential element of [the] case.' " *Id.* at 828, quoting from *Kourouvacilis* v. *General Motors Corp.,* 410 Mass. 706, 716 (1991). See *Boston Safe Deposit & Trust Co.* v. *Kingsbury,* 270 Mass. 243, 245 (1930) (to frame issue for adjudication, contestant must offer evidence "upon which there can justifiably be based a reasonable hope for a result favorable to the contestant[]"). To survive a motion for summary judgment,

---

[7]Doctor Kosowsky had also been chairman of the Maimonides School board of trustees for the previous fifteen years.

the contestant must "present specific facts establishing a genuine, triable issue." *O'Rourke* v. *Hunter, supra* at 821, quoting from *Cullen Enterprises, Inc.* v. *Massachusetts Property Ins. Underwriting Assn.,* 399 Mass. 886, 890 (1987). "[C]onclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient" to establish a triable issue. *Ibid.*[8] With the same record as the motion judge, we

[8]The Maimonides, Perkins, and Carroll contestants filed a motion to strike the exhibits attached by the proponents to their motion for summary judgment. In the motion to strike, dated August 5, 2004, the contestants argued that "[m]any of the [proponents'] exhibits contain inadmissible conclusions of laypersons regarding their opinion of the physical and mental health condition of Leonard R. Brener." The proponents' exhibits span over 700 pages. The contestants' trial and appellate briefs lack specific page references to the objectionable exhibits. However, the contestants have identified several of the objectionable exhibits by substance. We address them later in this note. The judge denied the motion to strike.

In Massachusetts only "the witnesses to the will, the [treating] physician, . . . and witnesses who by special skill and experience are qualified as experts in the knowledge and treatment of mental diseases . . . [may] give their opinions" of testamentary capacity. *May* v. *Bradlee,* 127 Mass. 414, 421 (1879). We have reviewed the proponents' exhibits. They consist mostly of affidavits, interrogatory answers, and other admissible evidence comprised of detailed firsthand observations of Brener and not of conclusions about his mental capacity to execute the second trust amendment. See Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002); Mass.R.Civ.P. 56(e), 365 Mass. 825 (1974). The proponents' memoranda of law in support of the motion for summary judgment and their briefs on appeal do not rely upon inadmissible opinions of lay witnesses. The judge did not rely upon opinions or conclusions of lay witnesses.

The contestant schools contend also that the judge wrongly refused to strike certain exhibits submitted by the proponents with their supplemental memorandum of law in support of their motion for summary judgment on August 12, 2004, one day before the hearing on their motion. See Mass.R. Civ.P. 56(c) (requiring ten days' notice). These exhibits consist of the depositions of Coles and of Attorney Jackson Wright, Jr., both taken on July 29, 2004, on behalf of the plaintiffs. (The contestant schools concede in their brief that the judge did not rely upon another exhibit to which they objected — the affidavit of an expert, Dr. Ronald Schouten, who expressed an opinion that Brener did not lack the requisite mental capacity on October 30, 2001.)

A motion judge has discretion to consider evidence not submitted in accordance with the ten-day notice requirement prescribed by Mass.R.Civ.P. 56(c), if the late filing "does not affect the opposing party's opportunity to develop and prepare a response." *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.,* 25 Mass. App. Ct. 302, 317 (1988), quoting from *USTrust Co.* v. *Kennedy,* 17 Mass. App. Ct. 131, 135 (1983). The parties in this litigation conducted extensive discovery. Notwithstanding their motion to strike the July

examine the allowance of summary judgment de novo. See *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 123 n.1 (1997).

2. *The standard for mental capacity.* The motion judge evaluated Brener's competence to execute the second trust amendment under the standard for testamentary capacity. The contestant schools (Maimonides, Perkins, and Carroll) argue that the complexity of Brener's trust required the motion judge to apply the standard for capacity to contract. The capacity to contract requires the ability to transact business, *Krasner* v. *Berk*, 366 Mass. 464, 467 (1974), and more specifically the ability to "understand the nature and quality of the transaction" and to "grasp its significance." *Ibid.*, quoting from *Sutcliffe* v. *Heatley*, 232 Mass. 231, 232-233 (1919). In contrast, the standard for testamentary capacity "requires ability at the time of execution of the alleged will to comprehend the nature of the act of making a will." *Palmer* v. *Palmer*, 23 Mass. App. Ct. 245, 250 (1986), quoting from *Goddard* v. *Dupree*, 322 Mass. 247, 250 (1948).

The motion judge correctly applied the standard for testamentary capacity and not the more demanding test for contractual capacity. First, Brener's trust instruments were not complex, even though they disposed of property worth millions of dollars. They did not require contractual capacity for their intelligent creation and execution.

Second, a pour-over will and a contemporaneously executed revocable inter vivos trust comprise "integrally related components of a single testamentary scheme." *Clymer* v. *Mayo*, 393 Mass. 754, 765 (1985). An important feature of that scheme is its disposition of property not during the testator's lifetime in the manner of a more traditional inter vivos trust, but after death in the manner of a will. See *id.* at 762, quoting from *Trosch* v. *Maryland Natl. Bank*, 32 Md. App. 249, 253 (1976) (the statute authorizing a pour-over will, G. L. c. 203, § 3B,

29, 2004, depositions of Coles and Wright, the contestant schools included and cited the depositions in their opposition to summary judgment filed on August 5, 2004, eight days before the hearing on August 13, 2004. They therefore suffered no prejudicial surprise. See *Makino, supra.* There was no error. Obviously compliance with the letter and purpose of the ten-day standard of rule 56(c) would prevent these quarrels.

inserted by St. 1963, c. 418, § 1, "is not conditioned upon the existence of a trust but upon the existence of a trust *instrument*"). The use of one standard for mental capacity to execute a pour-over will and another standard to execute a simultaneous revocable inter vivos trust would unnecessarily and impractically risk inconsistent results. See *Clymer, supra* at 766. The motion judge correctly applied the legal standard for testamentary capacity to evaluate Brener's mental capacity at the time of the execution of the second trust amendment, because Brener's pour-over will and the second trust amendment comprised "parts of an interrelated whole." *Ibid.* See 1 Scott & Fratcher, Trusts § 20, at 245 (4th ed. 1987) ("[i]f an owner of property has capacity to devise or bequeath it, he has capacity to devise or bequeath it in trust").

3. *Brener's testamentary capacity.* We consider next whether the factual materials created a genuine issue whether Brener had the requisite testamentary capacity to amend his trust. Beyond a general comprehension of the nature of making a will, the testator must understand "the nature and situation of his property and his relations to those persons who would naturally have some claim to his remembrance." *Palmer* v. *Palmer*, 23 Mass. App. Ct. at 250, quoting from *Goddard* v. *Dupree*, 322 Mass. at 250. Accord *O'Rourke* v. *Hunter*, 446 Mass. at 826-827. "[A] person . . . may possess testamentary capacity at any given time and lack it at all other times." *Id.* at 827, quoting from Dunphy, Probate Law and Practice § 23.4, at 437 (2d ed. 1997). "The proponent has the burden of proof on the issue of testamentary capacity." *O'Rourke, supra.* A presumption that the testator had the requisite testamentary capacity aids the proponent, but it disappears if the opponent presents evidence of lack of capacity. *Ibid.* The fact that the testator disposed of his property "in a manner that some may think unwise" does not amount to evidence of incapacity. *Cushman* v. *Nichols*, 20 Mass. App. Ct. 980, 982 (1985).

The proponents offered detailed and uncontested evidence comprised of medical records and firsthand observations of health care workers, Attorney Shaw, Coles, and the Rosens, corroborated by Brener's friends and family, that he was of sound mind, that he continued to manage his business affairs almost to the time

of his death, and that he understood the nature of his property and his relation to people around him, including the Rosens and the contestants. Before executing the second trust amendment, Brener reconsidered the size of his gifts to Maimonides School, the institution with which he had the strongest relationship among the four charitable beneficiaries. He went over the changes to the trust with Coles and Attorney Shaw on October 29. The next day, he again reviewed his changes and made further modifications before executing the second amendment. He added one of his nephews and an office friend to the list of the beneficiaries. He substantially increased the Rosens' share, but he also donated cash, stock proceeds, and annuities worth hundreds of thousands of dollars to Maimonides School during the remaining five weeks of his life. This range of activity reflects deliberation and judgment.

The contestants do not dispute this evidence. They rely on the opinions of Dr. Welch and Dr. Kosowsky that Brener lacked testamentary capacity on October 30, 2001. Doctor Welch had never met Brener. In his affidavit he recounted medical records at most tending to show that Brener suffered from physical ailments and related depression. But depression does not per se negate the testator's mental capacity. See *O'Rourke* v. *Hunter*, 446 Mass. at 822-827 (testatrix was competent despite evidence of depression; summary judgment affirmed against contestants). See also *Boston Safe Deposit & Trust Co.* v. *Kingsbury*, 270 Mass. at 245; *Union Trust Co. of Springfield* v. *Kittredge*, 298 Mass. 515, 516-517 (1937) (evidence of the decedent's depression and idiosyncrasies was insufficient to show a reasonable expectation of a verdict for contestants).

The record shows that Brener suffered severe depression accompanied by thoughts of suicide in February of 2001. The contestants do not dispute that Brener had the requisite mental capacity to name them beneficiaries in the first trust amendment on March 14, 2001. No evidence appears that Brener was senile or delusional or that he did not recognize his family and friends. Doctor Welch's promise to expand on his affidavit at trial could not forestall a motion for summary judgment. *Ng Bros. Constr., Inc.* v. *Cranney*, 436 Mass. 638, 648 (2002), quoting from *Community Natl. Bank* v. *Dawes*, 369 Mass. 550, 554 (1976) (non-

moving party must "present 'specific facts which establish that there is a genuine, triable issue' ").[9]

Doctor Kosowsky did not see or treat Brener from October 25 to November 1, 2001, and did not review Brener's medical records from Lasell House. See *O'Rourke* v. *Hunter*, 446 Mass. at 824 ("affidavit shed[] no light on the critical period when the testatrix met with her attorney, before finally executing her will"). Kosowsky's testimony concerned primarily Brener's TIA-related incident. He acknowledged that the incident resolved quickly and that Brener "improved considerably." The remainder of Dr. Kosowsky's testimony concerned Brener's depression. Kosowsky alluded to incidents of confusion after Brener returned to St. Elizabeth's Hospital on November 2, which do not bear on Brener's ability to understand the nature of his property and his relation to people around him.[10]

In sum, the contestants' evidence is insufficient to defeat the presumption that Brener had the requisite mental capacity to execute the second trust amendment, because it is not relevant, compare *Santos* v. *Chrysler Corp.*, 430 Mass. 198, 205-207 (1999), and because it is "based upon assumptions proved faulty by the undisputed facts otherwise presented." *Baptiste* v. *Sheriff of Bristol County*, 35 Mass. App. Ct. 119, 126 (1993). See *O'Rourke* v. *Hunter*, 446 Mass. at 827. See also *Union Trust Co. of Springfield* v. *Kittredge*, 298 Mass. at 516 (evidence that decedent was "physically sick and depressed" and opinions of psychiatrists that decedent was of unsound mind were insufficient to raise issue of capacity in light of proponents' detailed evidence that decedent "managed his business affairs with shrewdness and skill and with complete memory and compre-

---

[9]Welch's affidavit contains two categories of shortcomings. It does not take into account the testimony of multiple disinterested witnesses, including health care professionals, describing Brener as alert, oriented, and engaged during the period surrounding the second amendment. It does contain conclusory and speculative statements to the effect that Brener had made an "unnatural" disposition, had not understood the tax consequences of the distribution to family members, and "had always favored charities." These statements are not probative of capacity and are "insufficient to avoid summary judgment." *O'Rourke* v. *Hunter*, 446 Mass. at 821. See *id.* at 823-824, 827.

[10]In contrast, see *Duchesneau* v. *Jaskoviak*, 360 Mass. 730, 733 (1972) (treating physician testified that the testator was senile; other evidence, including hospital records, corroborated that testimony).

hension," and that "he was and remained a man of full intellect and sound capacity"); *Nichols* v. *Sullivan,* 340 Mass. 783, 783-784 (1959) ("[t]he expected testimony of psychiatrists who had not seen the decedent . . . was of substantially less weight than [the proponents' evidence,] which would support a finding of testamentary capacity"); *Brogan* v. *Brogan,* 59 Mass. App. Ct. 398, 402 (2003), overruled in part on other grounds by *O'Rourke* v. *Hunter,* 446 Mass. 814 (2006) (an affidavit which alleged that a testatrix "was terminally ill with cancer . . . [and] under the influence of pain control medication," but which did not take into account any observations of the testatrix at the time of her execution of her will, was insufficient to raise the issue of mental capacity).[11]

4. *Undue influence.* The contestants argue that Coles, Attorney Shaw, and the Rosens unduly influenced Brener to execute the second trust amendment. They point to several circumstances. Brener strongly disfavored paying estate taxes, yet left a substantial amount of money to the Rosens — a disposition that was "unnatural," because it would generate a significant tax liability. Attorney Shaw offered inconsistent versions of events preceding the execution of the second trust amendment so as to undermine the proponents' contention that Brener initiated contact with Shaw and Coles on October 28 or 29, 2001. Shaw, rather than an attorney from Palmer & Dodge (which had prepared the original will and trust and the first amendment to the trust), prepared the second trust amendment.

These allegations do not make the undue influence claim a triable issue. To prove undue influence, a contestant must show "that an (1) unnatural disposition has been made (2) by a person susceptible to undue influence to the advantage of someone

---

[11]We understand that summary judgment will often be inappropriate if state of mind persists as a material issue. See, e.g., *Quincy Mut. Fire Ins. Co.* v. *Abernathy,* 393 Mass. 81, 86 (1984). However, the mere assertion of a claim or defense containing an element of mentality does not entitle the party opposing summary judgment to a trial. Otherwise, easy pleading of unsubstantiated mental states would invariably cause wasteful trials. See *Dexter's Hearthside Restaurant, Inc.* v. *Whitehall Co.,* 24 Mass. App. Ct. 217, 223 (1987). The rules applicable to cases involving questions of testamentary capacity specifically permit summary disposition if the facts are insufficient to support a claim. See rules 16 and 27B of the Rules of the Probate Court (2007); *O'Rourke* v. *Hunter,* 446 Mass. at 816-820.

(3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means." *O'Rourke* v. *Hunter*, 446 Mass. at 828, quoting from *Tetrault* v. *Mahoney, Hawkes & Goldings*, 425 Mass. 456, 464 (1997). Otherwise the law respects the choices of the competent testator. It does not overrule them for reasons of questionable wisdom or social utility. "In many instances a finding of undue influence rests largely on circumstantial evidence, since direct evidence of such influence is often difficult to establish." *Miles* v. *Caples*, 362 Mass. 107, 112 (1972). Nevertheless, the standard of proof is demanding. "Mere suspicion, surmise or conjecture are not enough to warrant a finding of undue influence. There must be a solid foundation of established facts upon which to rest an inference of its existence." *Neill* v. *Brackett*, 234 Mass. 367, 370 (1920).

The evidence here does not create a genuine issue whether Brener's gift to the Rosens was unnatural. In the final stage they functioned as his closest family. They comforted him through the bleakness of terminal illness. His gratitude would be natural. The second amendment did not contradict any longstanding commitments to the four charitable institutions. Before the first trust amendment in March of 2001, Brener had not maintained relations with the Perkins School, the Carroll Center, or Beth Israel Deaconess Medical Center. He pursued his stronger connection with Maimonides School through the independent capital gift agreement of 1997 (worth $2.75 million) and the effective donations of his last five weeks (worth approximately $338,356). He had never made charitable donations of such magnitude before the first trust amendment in March of 2001, which had followed closely after the impact of the diagnosis.

Nor does the evidence generate the issue whether the Rosens "used [the] opportunity to procure the contested disposition through improper means." *O'Rourke* v. *Hunter*, 446 Mass. at 828. No information indicates that the Rosens had communicated with Coles or Attorney Shaw to accomplish the second amendment. The Rosens were not present at the execution of the amendment. (Brener had instructed Lois Rosen to leave him alone for a business discussion with Coles during the afternoon before the execution of the second amendment.) See *id.* at 828-

829 ("the proponent was not present when the testatrix signed her will"). No evidence indicates that the Rosens were aware of either the first or second trust amendments during Brener's life.

No evidence suggests that the Rosens prevented family, friends, or the contestants from visiting and communicating with Brener. See *Brogan* v. *Brogan*, 59 Mass. App. Ct. at 402 ("Care does not equate with control. . . . There is no allegation that [the proponent] limited access by family and friends [including the contestant] to the testatrix"). In sum, the contestants have not produced evidence to support their allegation that Brener's disposition of property was unnatural or that the Rosens engaged in improper conduct to achieve it. See *Heinrich* v. *Silvernail*, 23 Mass. App. Ct. 218, 227 (1986) ("[t]here is nothing wrong with providing aid and comfort to a failing person; indeed, such activity is warmly human . . . . The fact that the decedent may have had property that he might devise does not alone provide a basis for discrediting [a beneficiary's] motives or inferring the existence of undue influence").[12]

*Conclusion.* There was no error in the allowance of the proponents' motion for summary judgment and the denial of the contestants' cross motion for summary judgment.[13] Nor did the judge wrongly deny the contestant schools' motion to strike.

*Judgment affirmed.*

---

[12]Trustee Coles is a codefendant with the Rosens. He had a fiduciary relationship with Brener. Coles did not benefit from the final trust amendment. Rather, that amendment eliminated a gift of $15,000 to his wife, Elinor. Therefore no occasion arises to require Coles to assume any burden of disproving undue influence under the rule of *Cleary* v. *Cleary*, 427 Mass. 286, 294-295 (1998) (if a fiduciary benefits from a challenged transaction with the decedent, the burden of proving the absence of undue influence will fall upon him).

[13]The contestant schools (Maimonides, Perkins, and Carroll) claim that it was error for the motion judge to deny their cross motion for summary judgment without a hearing. Another hearing would have served no useful purpose. By filing a cross motion for summary judgment, the schools made a representation that no genuine issues of material fact remained. See *South Shore Bank* v. *H & H Aircraft Sales, Inc.*, 16 Mass. App. Ct. 472, 479 (1983). On appeal, they have not identified any "unexplored factual issue that would have a bearing on the [lower court's] decision [to deny their motion]." *Baldwin Crane & Equip. Corp.* v. *Riley & Rielly Ins. Agency, Inc.*, 44 Mass. App. Ct. 29, 32-33 (1997). We see no prejudice. See *Northrup* v. *Brigham*, 63 Mass. App. Ct. 362, 370 n.6 (2005).