NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1083

SANDRA A. MCLAUGHLIN, personal representative,[1]

vs.

KATHY T. SHEA.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Sandra A. McLaughlin, as the personal representative of the estate of John R. McLaughlin, appeals from a judgment entered in the Probate and Family Court dismissing John McLaughlin's equity complaint.  Sandra[2] claims, as she did at trial, that the defendant, Kathy T. Shea (Shea), obtained real estate from Ralph Caldwell (the decedent) through fraud and undue influence.  Sandra further claims that the decedent lacked the requisite capacity to deed the property to Shea.  We affirm.

---

[1] Of the estate of John R. McLaughlin.

[2] Because Sandra McLaughlin and her late husband, John McLaughlin, share a last name, we refer to them by their first names to avoid confusion.

Background.  The decedent died on July 27, 2020, at age ninety-two.  He never married, had no children, and was survived by his five nieces and nephews, including John and Shea.  The decedent lived in a home he owned in Charlestown (the Charlestown property) for many years before his death.[3]  John lived with the decedent at the Charlestown property from approximately 1984 to April 1996.  John married Sandra on August 4, 1996.

On October 4, 1984, the decedent executed a will in which he nominated his niece, Shea, as the executrix, and devised his estate to his sister in trust for the benefit of his mother.  Both of his sisters predeceased him.  On September 16, 2011, the decedent executed another will, again nominating Shea as the executrix and devising the Charlestown property to his nephew, John.  If John predeceased the decedent, then the Charlestown property would pass in equal shares to Shea and to one of the decedent's other nieces.  Also on September 16, 2011, the decedent executed a durable power of attorney and a health care proxy naming Shea as his attorney-in-fact and health care agent.

_____

[3] The decedent acquired the home in Charlestown by deed from his mother and an abutting parcel of property by deed from the Boston Redevelopment Authority.  As the distinction is immaterial to this appeal, we also refer to both parcels of property collectively as "the Charlestown property."

2

Sandra testified that on that same date, the decedent "told her he had changed his will to leave [the Charlestown property] to [John]." She further testified that she and John were under the belief that the property would pass to them upon the decedent's death, and thus she and John helped coordinate and pay for repairs at the Charlestown property.

In 2020, the decedent became critically ill and was hospitalized from June 22 through July 9, 2020. Initially, he was not allowed visitors due to COVID-19 precautions, but "[w]hen visitors were permitted, Ms. Shea visited the [d]ecedent every evening."[4] Although the decedent was weak while in the hospital, he was able to carry on conversations, was aware of what was going on, and could make his own decisions. The judge credited Shea's testimony that in January or February 2020, the decedent told her that he "was going to give her" the Charlestown property and, while he was in the hospital, told her to contact an attorney because "he wanted to get it done." On July 8, 2020, Shea contacted Attorney Bradford Fortin, an

---

[4] Sandra testified that she and John did not visit the decedent in the hospital because they were told he was heavily sedated and hallucinating; the judge, however, did not credit this testimony.

3

attorney she previously hired for other matters,[5] to assist the decedent with making changes to his estate plan. The decedent and Attorney Fortin spoke on the phone and Attorney Fortin warned the decedent that leaving the Charlestown property to Shea would "make [John] unhappy" because the decedent had left the property to him in the 2011 will.

On July 9, 2020, the decedent was discharged from the hospital to Shea's home for hospice care, and Shea cared for him until his death. Around this time, the decedent's primary care physician noted that the decedent experienced some delirium and was prescribed medication.[6]

On July 15, 2020, Attorney Fortin met with the decedent in person at Shea's home and testified that the decedent was clean-shaven, his clothes were clean, and he appeared "alert, clear-headed, and focused."[7] The judge found that Shea was not in the

---

[5] Attorney Fortin represented Shea in or around 2011 and assisted her with income taxes, probating her mother's estate, and her own estate planning.

[6] The decedent was prescribed oxycodone and Seroquel, and medical records indicated, inter alia, that he was "confused at night."

[7] Attorney Fortin testified that his practice when meeting with elderly clients was to assess their cognitive ability to ensure that they know what they are doing. The decedent knew the year and month, although not the exact date, and he also knew who the president was. The decedent said he had not taken any medications that day and that he had two sisters who had passed away. The decedent was aware that John was sick at this

4

room while Attorney Fortin and the decedent talked.  The decedent signed two deeds, conveying a remainder interest in the Charlestown property to Shea, and reserving for himself a life estate.  The judge credited Shea's testimony that she never asked for the "Charlestown real estate."  Later that day, John and Sandra visited the decedent and testified that they did not engage in a conversation with him because of his pain level.  The decedent died on July 27, 2020 -- twelve days after the signing of the deeds.

On December 8, 2020, John filed the underlying case as an equity action alleging fraud or undue influence by Shea, and that the decedent lacked the capacity to execute the deeds.  On November 16, 2022, following John's death, Sandra substituted herself as plaintiff and personal representative of John's estate.  The judge determined the burden of proving undue influence remained on Sandra as the challenger, even though Shea was a fiduciary.

_____

time, and the decedent told Attorney Fortin that he did not want the real estate to go to Sandra if John died.  The decedent also explained to Attorney Fortin that he was not fond of Sandra; he wanted the property to stay in the family; and he thought that Sandra, a real estate agent, would sell the property.  Attorney Fortin asked if he was being forced in any way to sign the deeds and if he was afraid that Shea would stop caring for him if he did not transfer the real estate.  The decedent responded "absolutely not and said that Ms. Shea was like a daughter to him."

Upon consideration of all the evidence, the judge found that the deeds signed by the decedent were not the product of fraud or undue influence and that the decedent had the capacity to execute the deeds.  Sandra filed a notice of appeal on May 7, 2024.

Discussion.  1.  Undue influence.  Sandra challenges the judge's allocation of the burden of proof on the issue of undue influence as well as the judge's conclusion of law that there was no undue influence.  We discuss each in turn.

a.  Burden of proof.  "To prove undue influence, a contestant must show 'that an (1) unnatural disposition has been made (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means.'" Maimonides Sch. v. Coles, 71 Mass. App. Ct. 240, 255-256 (2008), quoting O'Rourke v. Hunter, 446 Mass. 814, 828 (2006).  "In a will contest involving allegations of undue influence, the burden of proof ordinarily rests with the party contesting the will."  Matter of the Estate of Moretti, 69 Mass. App. Ct. 642, 651 (2007).  "[I]n cases involving a fiduciary, the fiduciary who benefits in a transaction with the person for whom [she] is a fiduciary bears the burden of establishing that the

6

transaction did not violate [her] obligations" (quotation and citation omitted).[8]  Matter of the Estate of Urban, 102 Mass. App. Ct. 284, 290 (2023).  However, "[t]he burden of proving the absence of undue influence shifts to the fiduciary only where [she] has actually taken part in the questioned transaction" (citation omitted).  Id.

Sandra argues that the judge erred in allocating the burden of proving undue influence to her because Shea was a fiduciary under the power of attorney and health care proxy.  We disagree.  There is no evidence that Shea "ha[d] actually taken part in the questioned transaction" (citation omitted).  Matter of the Estate of Urban, 102 Mass. App. Ct. at 290.  Shea was not present during the execution of the deeds and there is no evidence that she asked Attorney Fortin to prepare the documents or directed provisions of the deeds.  Moreover, the record supports the judge's findings that Attorney Fortin provided independent counsel to the decedent and that Shea neither asked Attorney Fortin to have the deeds executed nor directed him regarding the provisions.  Indeed, Attorney Fortin made every effort to explain to the decedent, and did explain, each part of the deeds, without Shea's participation or involvement. Ultimately, the judge concluded that there was no credible

---

[8] Sandra does not contest that Shea was a fiduciary.

evidence that Shea ever acted as the decedent's attorney-in-fact and that under the facts of the present case delineated supra, the burden of proof "does not shift to Ms. Shea." The record, analyzed in view of the judge's detailed findings and credibility determinations, supports this conclusion.[9]

b. Undue influence. Sandra does not challenge the findings of fact made by the judge and instead challenges the judge's conclusion of law that Shea did not exert undue influence on the decedent. Thus, the only question before us is whether the findings made by the judge were sufficient to

_____

[9] Sandra argues, in the alternative, that the judge erred by not lowering the burden of proof due to Shea's "confidential" relationship with the decedent. "'[W]here a confidential relationship exists it generally takes less to establish undue influence on the part of beneficiaries' than in the ordinary case" where no such relationship exists. Cleary v. Cleary, 427 Mass. 286, 290 n.2 (1998), quoting Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 465 (1997). Confidential and fiduciary relationships are distinct types of relationships with different legal implications. See Heinrich v. Silvernail, 23 Mass. App. Ct. 218, 225 & n.8 (1986). Here, Shea does not cite any persuasive Massachusetts precedent to support her argument. In any event, "[w]hether a relationship of trust and confidence exists is a question of fact," Markell v. Sidney B. Pfeifer Found., Inc., 9 Mass. App. Ct. 412, 444 (1980), and we discern no clear error in the judge's findings which have ample support in the record. See note 10, infra. See also Rempelakis v. Russell, 65 Mass. App. Ct. 557, 566 n.13 (2006) ("a fiduciary relationship plainly existed by virtue of the power of attorney . . . and we do not consider what the outcome might be in a confidential, but not fiduciary, relationship"); Collins v. Huculak, 57 Mass. App. Ct. 387, 394 (2003) ("a confidential relationship does not arise merely by reason of family ties" [citation omitted]).

8

warrant her conclusion of law.  See Smolak v. Kulpinski, 11
Mass. App. Ct. 1001, 1001 (1981).  See also First Penn. Mtge.
Trust v. Dorchester Sav. Bank, 395 Mass. 614, 621 (1985)
("appellate courts must constantly have in mind that their
function is not to decide factual issues de novo" [citation
omitted]).

The judge found that an unnatural disposition was not made,
and Shea did not procure the contested disposition through
improper means.  As detailed above, the judge's findings have
ample support in the record, and thus we cannot say that the
judge erred.  See Maimonides Sch., 71 Mass. App. Ct. at 255-
256.[10]

_____

[10] Assuming, arguendo, that Sandra did challenge the judge's
findings of fact, her claim would still fail.  We review
findings of fact under the clearly erroneous standard.  "A
finding is clearly erroneous . . . when there is no evidence to
support it, or when, 'although there is evidence to support it,
the reviewing court on the entire evidence is left with the
definite and firm conviction that a mistake has been made.'"
Michelon v. Deschler, 96 Mass. App. Ct. 815, 816 (2020), quoting
Care & Protection of Olga, 57 Mass. App. Ct. 821, 824 (2003).
Here, the judge's finding that the decedent's gift to Shea was
not an unnatural disposition is not clearly erroneous.  Shea had
a close relationship with the decedent and cared for him as his
health was failing.  While he was in the hospital, she talked
with him every day on the phone, and once visits were permitted,
she visited him every evening and upon his discharge, assisted
him with his daily needs.  Shea was able to ensure that he did
not go to a nursing home.  The judge also credited evidence that
John was sick in July 2020, that the decedent was aware of his
sickness, and that the decedent did not want the property to go
to Sandra in the event of John's death.  Here again, although

c.  Capacity to deed.  Sandra next alleges that the judge

erred by finding that the decedent had the requisite capacity to

deed the property to Shea.  Shea only challenges the judge's

conclusions of law, which we review de novo.  See Kitras v.

Aquinnah, 474 Mass. 132, 139, cert. denied, 580 U.S. 1000

(2016).  The argument is unavailing.

The parties and the judge analyzed the capacity to deed

under both the testamentary capacity standard and the

contractual capacity standard.  Indeed, the standards are

distinct, but the capacity to contract is the standard

applicable to deeds.[11]  See Farnum v. Silvano, 27 Mass. App. Ct.

_____

the parties contested these issues at trial, the record supports
the judge's findings.

[11] Deeds differ from wills and other testamentary
instruments in ways that bear upon the level of mental capacity
required to execute them.  Unlike wills, which remain revocable
until death, deeds are irrevocable once delivered, absent
limited circumstances such as mutual mistake.  See Swan v.
Sayles, 165 Mass. 177, 178 (1896); Ward v. Ward, 70 Mass. App.
Ct. 366, 369 (2007).  Because an irrevocable conveyance effects
an immediate transfer of property interests, it may permanently
deplete resources the grantor may still need during life.  See
Restatement (Third) of Property:  Wills & Other Donative
Transfers § 8.1 comment d (2003); Ryan v. Colombo, 77 Or. App.
71, 79-80 (1985).  In contrast, a will allows the testator to
retain control over the property for the remainder of life and
to modify the disposition at any time before death.  Swan,
supra.

Indeed, even in a case like the one before us, where a
grantor conveys a remainder interest in property through a deed
while retaining a life estate, the grantor's control over the
property during the grantor's life is constrained.  In such a

10

536, 536, 538 (1989).  The capacity to contract is a standard more demanding than testamentary capacity.  See Maimonides Sch., 71 Mass. App. Ct. at 251.  It requires the ability to "understand the nature and quality of the transaction" and to "grasp its significance."  Id., quoting Krasner v. Berk, 366 Mass. 464, 467 (1974).  "[A]n agreement is voidable by a person who, due to mental illness or defect, lacked the capacity to contract at the time of entering into the agreement" (quotation and citation omitted).  Dacey v. Burgess, 491 Mass. 311, 318 (2023).  "We have required proof that the person in question was too weak in mind to execute the deed with understanding of its meaning, effect and consequences" (quotation and citation omitted).  Krasner, supra.  "[I]t is a question of fact whether a person was competent to enter into a transaction . . . ."  Sparrow v. Demonico, 461 Mass. 322, 328 (2012).  "The burden is on the party seeking to void the contract to establish that the

circumstance, the grantor's present interest is subject to the future interests of the grantee and constrained by duties to avoid waste, thereby limiting the grantor's control over the property during life.  See, e.g., Lodigiani v. Paré, 103 Mass. App. Ct. 140, 144 (2023).  Because a deed can irrevocably affect both present and future property interests and restrict the grantor's control during life, the mental capacity required to execute such a conveyance must be sufficient to understand and consent to these binding consequences.  Thus, the governing standard for capacity to execute a deed is contractual capacity. See Farnum, 27 Mass. App. Ct. at 536, 538.

11

person was incapacitated at the time of the transaction." Id. at 327.

In the present case, there was sufficient credible evidence to demonstrate the decedent's capacity to contract. While there was some evidence of his delirium and confusion in the hospital, there was no expert testimony regarding the decedent's medical conditions or the effect of his prescribed medications. Moreover, Attorney Fortin met with the decedent and discussed his health issues, the fact that the deed would upset John, and confirmed that the decedent wanted to convey the real estate to Shea because she was "like a daughter to him." There is some evidence of incapacity, including, inter alia, that the decedent's signature differed from previous signatures; however, there was also credible evidence that Attorney Fortin was aware that the decedent's vision was impaired and that he explained the deeds to the decedent. As the judge concluded, there was no credible evidence that Shea or Attorney Fortin had reason to suspect that the decedent was incapable of contracting and, to the contrary, Attorney Fortin confirmed that the decedent was able to understand the consequences of deeding the property to Shea. Contrast Farnum, 27 Mass. App. Ct. at 540. Furthermore, the judge found that the decedent had legitimate reasons for

12

doing so, and the record supports those findings.  Thus, we cannot say that the judge erred as a matter of law.

d.  Barker affidavit.  Finally, Sandra contends that the judge erred by not crediting the affidavit of Nurse Barker, a visiting nurse who was involved in caring for the decedent in June and July of 2015.  "We accord the credibility determinations of the judge who heard the testimony of the parties . . . [and] observed their demeanor the utmost deference" (quotation and citation omitted).  Ginsberg v. Blacker, 67 Mass. App. Ct. 139, 140 n.3  (2006).  See id. at 147-148.  Nurse Barker submitted an affidavit averring, inter alia, that on July 15, 2020, the decedent was "presenting with an altered mental status that rendered him not competent."  In July 2022, however, Nurse Barker suffered a stroke which impacted her ability to speak.  At trial she provided "one-word, affirmative answers to questions" on direct examination, and "one-word answers that were not responsive to the questions asked" on cross-examination.  The judge found that "[i]t is not clear whether she did not understand the questions, did not remember the answers, or was unable to express herself due to her stroke," and gave little weight to her affidavit and testimony.  Our review yet again confirms that the judge's

findings are supported by the record, and thus we discern no error.[12]

Judgment affirmed.

By the Court (Blake, C.J., Neyman & Grant, JJ.[13]),

Clerk

Entered: January 20, 2026.

---

[12] Shea's request for attorney's fees and costs is denied.

[13] The panelists are listed in order of seniority.

14