EVA BAPTISTE, administratrix,[1] vs. SHERIFF OF BRISTOL
COUNTY & others.[2]

No. 91-P-1321.

Bristol. February 10, 1993. - August 12, 1993.

Present: PERRETTA. GREENBERG. & LAURENCE. JJ.

Civil Rights, Availability of remedy. Constitutional Law, Cruel and un-
usual punishment. Imprisonment, Safe environment. Negligence, Cor-
rectional facility. Practice, Civil, Summary judgment, Presentment of
claim under Massachusetts Tort Claims Act. Massachusetts Tort
Claims Act.

Federal civil rights claims under 42 U.S.C. § 1983 (1982) arising from
the fatal stabbing of the plaintiff's son by a pretrial detainee with whom
he was confined at a county correctional facility, were properly dis-
missed in summary judgment proceedings, where the defendants sus-
tained their burden of demonstrating that the plaintiff had no reasona-
ble expectation of proving that they had been deliberately indifferent to
her son's right to personal security. [122-126]
Negligence claims under G. L. c. 258, the Massachusetts Tort Claims Act,
arising from a stabbing at a county correctional facility, were properly
dismissed in summary judgment proceedings on the ground that the
plaintiff failed to comply with the presentment requirements of G. L. c.
258, § 4, where the plaintiff's letter presenting her claims was directed
to the sheriff of the county rather than to the county commissioners,
who, as the "executive officer[s]" of the defendants' "public employer,"
as defined in G. L. c. 258, § 1, were the proper recipients of the letter.
[126-128]

CIVIL ACTION commenced in the Superior Court Depart-
ment on November 19, 1984.

The case was heard by John J. O'Brien, J., on motions for
summary judgment.

Kenneth J. King for the plaintiff.
John C. Corrigan, Jr., for the defendants.

---

[1]Of the estate of Michael Baptiste.
[2]The former sheriff and special sheriff and Bristol County.

PERRETTA, J. On November 20, 1981, Michael Baptiste, an inmate at the Bristol County Correctional Facility (facility), was fatally stabbed by a pretrial detainee with a pair of scissors. The plaintiff brought this action seeking wrongful death damages under 42 U.S.C. § 1983 (1982) and G. L. c. 258, § 2. Concluding that the plaintiff had no reasonable expectation of proving that the defendants had been deliberately indifferent to her son's right to personal security and that she had failed to comply with the presentment requirements of G. L. c. 258, § 4,[3] the Superior Court judge granted the defendants' motion for summary judgment brought under Mass.R.Civ.P. 56, 365 Mass. 824 (1974). We affirm the judgments.

1. *The stabbing.* We relate the undisputed facts as they appear in the materials submitted by the parties on the defendants' motion. At all times material to this action, the facility consisted of the Bristol County jail, for the pretrial detainees or "jailers," and the Bristol County house of correction, for the convicted offenders or "housemen." The facility was comprised of a set of physically connected buildings. Although "jailers" and "housemen" lived, exercised, and dined apart from each other, they would come in contact in a busy area of the facility known as the "wing." The visiting room, stairs to the canteen, the barbershop, and doors leading to the central receiving area and the yard were all situated in or off the wing area. It was a site of much pedestrian traffic as people passed to and from the various parts of the facility.

As best we can decipher from the materials, the barbershop is located at the bottom of the stairs leading to the canteen and across from the door leading to the yard. It is no more than an unused cell with a sink, a barber's chair, and a narrow wall-shelf or sill running the length of the cell. There is a concrete ledge, previously used for food trays, on the inside of the door just beneath a barred window. The bars are

---

[3]Presentment was not made by appellate counsel.

spaced sufficiently apart to allow someone in the corridor to reach through and to the ledge or the shelf.

An inmate wishing a haircut would be locked in the barbershop with the barber, another inmate trained to cut hair. A guard would then request the necessary implements from the guard at the desk in the receiving area of the facility, count them, and bring them to the barber. While giving a haircut, the barber would place the instruments not in immediate use on the ledge or shelf. Neither the barber nor the other inmate could leave the cell until the cutting tools had been counted and returned to the receiving area.

On November 20, 1981, the barbershop was in use when Edward Jones, a "jailer," was ordered to report for transportation to court. He and other "jailers" were escorted by guards to the wing area of the facility. Baptiste, a "houseman," was in that area as a "runner," that is, an inmate authorized to run errands and carry messages within the facility. When Jones saw Baptiste, he knocked him to the floor with a single blow, threw himself atop, and stabbed him with a pair of scissors that he had taken from the barbershop by reaching through the window.

Although there had not been any incidents of misconduct by Jones between the time of his arrival at the facility on November 12, 1981, and the stabbing, Jones had a history of violent and abusive behavior. He had served a full sentence at Massachusetts Correctional Institution, Cedar Junction, with no credit for good behavior, and he had been housed at the facility numerous times between 1966 and 1981, both as a pretrial detainee and as a committed offender. During these prior periods of incarceration, Jones had been physically abusive to himself and others, and, on several occasions, he had been referred to Bridgewater State Hospital for psychiatric evaluations. It was determined on each such occasion that Jones, although not free of problems, was sufficiently fit to be placed in a general prison population. Prior to the stabbing, there were no known arguments between Jones and Baptiste. Although one correctional officer testified that he had heard them calling each other names on some unknown

date, he also stated that name calling "was a common thing around the institution."

2. *The § 1983 claims.* "Although the state is not obliged to insure an assault-free environment, a prisoner has a constitutional right to be protected from the unreasonable threat of violence from his fellow inmates." *Morgan* v. *District of Columbia*, 824 F.2d 1049, 1057 (D.C. Cir. 1987), and cases cited. The plaintiff's claim under 42 U.S.C. § 1983 is based upon the defendants' alleged deliberate indifference to her son's right under the Eighth and Fourteenth Amendments to the United States Constitution to a reasonably safe prison environment. "When prison officials intentionally place prisoners in dangerous surroundings . . . when they are 'deliberately indifferent' either to prisoners' health or safety, they violate the Constitution." *Cortes-Quinones* v. *Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988).

A deliberate indifference to Baptiste's safety was demonstrated by the defendants, the plaintiff argues, in three respects: (a) the lack of a classification plan which would have restricted Jones to a secure area of the jail; (b) an inadequate training program for the facility's correctional officers; and (c) maintenance of the barbershop in an unsafe manner. In considering these claims, we keep in mind that, while deliberate indifference bespeaks a "mental state [that] can aptly be described as 'recklessness,' it is recklessness not in the tort-law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable." *DesRosiers* v. *Moran*, 949 F.2d 15, 19 (1st Cir. 1991), citing to the discussion in *Wilson* v. *Seiter*, 501 U.S. 294, 298-304 (1991), that for offending conduct to rise to the level of deliberate indifference it must be wanton.

(a) *A classification plan.* There is no dispute that the defendants did not implement a classification program pursuant to and consistent with the requirements of 103 Code Mass. Regs. §§ 942.01 et seq. (1979). As in effect in 1981, those regulations required that pretrial detainees and committed offenders be housed separately, § 942.02(2), that inmates presenting a threat to other inmates be housed separately,

§ 942.02(4), and that provisions be made "for close supervision and separate housing where necessary of inmates who[ ] the facility administrator has reason to believe are mentally ill." § 942.03(1).

There is no dispute that the pretrial detainees and committed offenders were, in fact, housed in separate sections of the facility. Although the defendants might have failed to implement a classification plan within the letter of the regulations, they did have in effect, as of June 1, 1980, a procedures statement setting out standards for identifying symptoms of mental illness and the steps to be taken upon observation of any of the telltale signs. Moreover, it is also undisputed that from the day of Jones's arrival until the time of the stabbing, there was nothing in his behavior to put anyone on notice that psychiatric intervention was in order. If "close supervision" of Jones under § 942.03(1) was required by reason of his past history of abusive and violent conduct, there is nothing in the record to show that he did not receive it. Jones was being escorted through the wing area of the facility to report for transportation to court for a required appearance.

These undisputed facts show that the plaintiff had no reasonable expectation of proving that her son's death was the result of the defendants' deliberate indifference to the need either to house separately or to supervise closely Jones, notwithstanding their failure to implement a classification program. Contrast *Cortes-Quinones* v. *Jimenez-Nettleship*, 842 F.2d at 559-560.

(b) *Inadequate training.* The depositions of numerous correctional officers reveal that the training experience of each varied. All but one, William Fermino, testified to many years of on-the-job experience and training as well as attendance at various programs and courses. Fermino began his employment at the facility in June, 1981. He stated that he received "in-service training, which touches on a little bit of everything." As described by him, that training consists of "about two-and-a-half-hour sessions once a month" on different topics. However, as of the date of the stabbing, he had not been taught how to restrain inmates engaged in a fight. When try-

ing to separate Jones and Baptiste, Fermino felt that he did not know what he was doing.

This undisputed testimony not only fails to reflect any wanton or callous disregard for the need to train correctional officers, it further shows that there is no causal link between Baptiste's death and any alleged failure to train Fermino. On the day of the stabbing, Fermino was in charge of the yard door. He had been instructed not to allow anyone into the wing area who did not belong there. Even if these instructions are deemed lacking, it is of no consequence. Both Jones and Baptiste were properly in the wing area.

When Fermino saw Jones and Baptiste, they were on the floor struggling. Fermino ran over to break up the fight and also ended up on the floor. A second officer, Charles LaViolette, joined the fray. As he pulled Baptiste away, he saw that Jones had a pair of scissors. He called out a warning to Fermino, who was able to grab Jones from behind and, with the assistance of a third officer, pull him away. LaViolette was riding on Baptiste's back, trying to keep him from lunging for Jones. He was able to force Baptiste away from Jones and Fermino and bring him to his knees. Baptiste was demanding to be let free to hit Jones. Fermino had been stabbed in the arm, but it was not apparent that Baptiste had been stabbed until he had been subdued by LaViolette, who then could see that Baptiste was bleeding.

Even assuming that the plaintiff could show that the need for further training was so plainly obvious that the failure to provide it could be deemed as a " 'deliberate indifference' to constitutional rights," *Canton* v. *Harris*, 489 U.S. 378, 390 n.10 (1989), she cannot demonstrate that the stabbing "[w]ould . . . have been avoided had the employee been trained under a program that was not deficient in the identified respect," *id.* at 391, that is, how to restrain combative inmates. Contrast *Cortes-Quinones* v. *Jimenez-Nettleship*, 842 F.2d at 560. Cf. *Bordanaro* v. *McLeod*, 871 F.2d 1151, 1157 (1st Cir. 1989).

(c) *Barbershop security.* We accept the plaintiff's premise that, but for the fact that Jones could reach through the bar-

bershop window, he would not have been able to take the scissors with which he stabbed Baptiste. It is even likely, as the plaintiff argues, that the stabbing would not have occurred had there been a screen over the window or an officer at the door. Those facts, however, are insufficient to show that the defendants were deliberately indifferent to the risk of inmates gaining possession of sharp implements.

It is undisputed that the defendants had a sound policy in respect to issuing and retrieving the cutting tools to keep them from the inmate population. If, as the inmate barber testified at his deposition, inmates regularly reached through the windows for the scissors to trim their moustaches, no evidence was proffered to show that the defendants had knowledge of any such practice. Cf. *Canton* v. *Harris*, 489 U.S. at 390 n.10, second par.; *Voutour* v. *Vitale*, 761 F.2d 812, 820 (1st Cir. 1985), citing *Herrera* v. *Valentine*, 653 F.2d 1220, 1225 (8th Cir. 1981).

What was proffered by the plaintiff showed, at best, a failure on the part of the defendants to recognize that, in spite of the existing security measures, there was yet another possible means of access to the scissors. As arguably negligent as the defendants might have been in failing to see and to protect against this possibility, such proof is insufficient to satisfy the high "deliberately indifferent" standard articulated by the Supreme Court in *Estelle* v. *Gamble*, 429 U.S. 97 (1976). See also *Wilson* v. *Seiter*, 501 U.S. at 303; *Des-Rosiers* v. *Moran*, 949 F.2d at 19.

Moreover, any showing of mere negligence on the part of the defendants was not enough to defeat summary judgment on the plaintiff's § 1983 claim. Relying on *Inferrera* v. *Sudbury*, 31 Mass. App. Ct. 96, 102-103 (1991), and the various cases and authorities therein cited, the plaintiff argues that it was error to take from a jury the question of the degree of the defendants' negligence.

Because of application of the reasonable person standard to facts sufficient to raise a genuine issue as to whether a reasonable person in a defendant's position would have acted differently, summary judgment is rarely granted in negli-

gence actions. *Ibid.* Where, however, the undisputed facts show that, as matter of law, there is no evidentiary support for a finding by reasonable people that a defendant was negligent, there is no genuine issue of fact to put to a jury. This same reasoning holds true in civil rights claims where the applicable standard, deliberate indifference, is much greater than negligence. See, e.g., *Voutour* v. *Vitale*, 761 F.2d at 817-819; *Santiago* v. *Fenton*, 891 F.2d 373, 381-382 (1st Cir. 1989).

Finally, it appears that, in granting the defendants' motion for summary judgment, the judge disregarded the affidavit from the plaintiff's expert, a consultant on prison administration and construction. There was no error. A reading of the affidavit shows that many of the expert's statements are based upon assumptions proved faulty by the undisputed facts otherwise presented. Further, his statement that the defendants' actions constituted deliberate indifference to security risks would not be admissible at any trial. See *Commonwealth* v. *Gardner*, 350 Mass. 664, 666-667 (1966); *DeCanio* v. *School Comm. of Boston*, 358 Mass. 116, 125-126 (1970). See also McCormick, Evidence § 12 (4th ed. 1992). If, because of the absence of a motion to strike, the judge could have exercised his discretion to consider such statements in ruling on the motion for summary judgment, he was not required to do so. See *Madsen* v. *Erwin*, 395 Mass. 715, 721 (1985).

On the record before us, we conclude that the defendants sustained their burden of demonstrating that the plaintiff had no reasonable expectation of proving the essential elements of her civil rights claims. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

3. *The negligence claims.* Because the plaintiff failed to comply with G. L. c. 258, § 4, and present her claims to the defendants' employer, the judge also granted summary judgment on the counts alleging negligence. She argues that the circumstances of her presentment made it sufficiently adequate so as to excuse her from strict compliance with the statutory requirement. As noted in *Krasnow* v. *Allen*, 29

Mass. App. Ct. 562, 567 n.7 (1990), "[e]xceptions to the strict application of the presentment requirement have been made only in those unusual cases in which, by conduct in the course of litigation, a public employer, at a time when presentment could still have been made, lulled a plaintiff into believing that proper presentment would not be an issue in the case. See *Vasys* v. *Metropolitan Dist. Commn.*, 387 Mass. 51, 57 (1982); *Moran* v. *Mashpee*, 17 Mass. App. Ct. 679, 681 (1984); *White* v. *Metropolitan Dist. Commn.*, 21 Mass. App. Ct. 106, 109-110 (1985)."

Presentment was required by G. L. c. 258, § 1, to be made upon the county commissioners of Bristol County. The plaintiff's presentment letter, dated November 15, 1983, was directed to the defendant sheriff of Bristol County, David Nelson. The summary judgment materials show that Nelson relayed the letter to the attorney for the sheriff's department, Mr. Ronald Lowenstein. From all that appears in the record, the matter then remained dormant until the filing of the complaint on November 19, 1984.

In answering to the complaint, the defendants denied that the plaintiff had made a proper presentment. Because it was by then too late to cure any defect,[4] the plaintiff takes the position that in November, 1983, Mr. Lowenstein also represented the county commissioners and that he should have brought the letter to their attention. Even assuming that Mr. Lowenstein did represent the county commissioners at that time, a fact denied by him at his deposition, presentment to him through Nelson is not equivalent to presentment to the county commissioners. See *Holahan* v. *Medford*, 394 Mass. 186 (1985), holding that, in an action against the city, presentment to the school superintendent and city solicitor did not satisfy the requirements of § 4.[5] Summary judgment on

---

[4]Section 4, inserted by St. 1978, c. 512, § 15, requires that presentment be made "within two years after the date upon which the cause of action arose," and that the action be brought no more than "three years after the date upon which such cause of action accrued." The plaintiff met each of the deadlines by a matter of days.

[5]Although § 4, as amended by St. 1988, c. 217, and St. 1989, c. 161, specifies particular instances in which a public attorney may act as an ex-

the plaintiff's negligence claims was properly granted to the defendants.

*Judgments affirmed.*

ecutive officer for purposes of receiving presentment of a claim, those amendments, even had they been in effect in 1983, are not directed to cases involving claims against a county employee.