NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

22-P-498                                        Appeals Court

OBAIDA ABDULKY[1] & another[2] vs. LUBIN & MEYER, P.C., & others.[3]

No. 22-P-498.

Worcester.      December 8, 2022. – March 28, 2023.

Present: Milkey, Ditkoff, & Englander, JJ.

Attorney at Law, Malpractice. Contract, Settlement agreement, Minor. Collateral Estoppel. Estoppel. Judicial Estoppel. Evidence, Expert opinion, Legal malpractice. Witness, Expert. Practice, Civil, Summary judgment.

Civil action commenced in the Superior Court Department on August 14, 2018.

The case was heard by Janet Kenton-Walker, J., on a motion for summary judgment.

A proceeding for interlocutory review was heard in the Appeals Court by Singh, J.

Joseph D. Lipchitz (Bridgitte E. Mott also present) for the defendants.
Peter J. Brockmann for the plaintiffs.

_____

[1] As parent and next friend of Anthony Abdulky.

[2] Ward Abdulky, as parent and next friend of Anthony Abdulky.

[3] Andrew C. Meyer, Jr., and Krysia Syska.

ENGLANDER, J.  This is an action for attorney malpractice. The defendants (defendants or defendant lawyers) represented the plaintiffs, parents of a minor child whose arm was amputated below the elbow at age five, in a medical malpractice action that was settled in 2015 for $6 million.  The plaintiffs (parents) thereafter brought this suit, arguing that their lawyers failed to competently develop evidence of damages -- in particular, the lifetime costs of the child's medical treatments and prosthetics -- and that this failure resulted in a lower recovery than should have been obtained.  The defendants moved for summary judgment on several grounds, including (1) that the plaintiffs' claims were barred by collateral estoppel, because a Superior Court judge determined that the settlement was reasonable, after a hearing pursuant to G. L. c. 231, § 140C 1/2; (2) that the plaintiffs' claims were barred by the doctrine of judicial estoppel, due to representations that the plaintiffs made to the court during the settlement process; and (3) that the plaintiffs had not elicited competent evidence of damages -- that is, had not shown, by admissible evidence, that proper legal representation would have resulted in a settlement or verdict greater than $6 million.

A different Superior Court judge (motion judge) denied the motion for summary judgment, and a single justice of this court granted the defendants leave to take this interlocutory appeal. While we agree with the motion judge that the plaintiffs' claims were not barred by either collateral estoppel or judicial estoppel, we conclude that the plaintiffs did not adduce evidence of damages "such . . . as would be admissible" at trial. Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974) (rule 56 [e]). Accordingly, the order denying the motion for summary judgment must be reversed.

Background. 1. The medical malpractice lawsuit. The child, then age five, was admitted to UMass Memorial Medical Center (hospital) for a fractured wrist. Due to complications arising from the child's treatment, the child's right arm was amputated below the elbow. In 2012, the parents (on behalf of the minor child) sued nine physicians associated with the hospital as well as the Commonwealth (hospital defendants), alleging claims of professional negligence. The parents also asserted a loss of consortium claim on their own behalf.

The parties engaged in mediation and settlement negotiations, and in mid-August 2015 the hospital defendants' insurer made a settlement offer of $6 million. After much discussion with their attorneys (the defendants in this case), and after a meeting with the Superior Court session judge

(settlement judge), the parents directed and authorized the defendant lawyers, in writing, to accept the settlement offer. On August 27, 2015, the defendant lawyers advised the hospital defendants, also in writing, that the offer was accepted.

The settlement judge was advised that the parties had settled, and he scheduled a hearing to review the proposed settlement, with the first of (what turned out to be) three hearings occurring on September 17, 2015.  The judge opened the first hearing by noting that, although he had expected to approve the settlement at that time, he had been advised that the particulars were not yet finalized and that the parents were attempting to "pull[] away from the settlement."  The judge then inquired of the parents whether the case was in fact settled. The parents acknowledged that it had been reported to the court that the case had settled, but explained that they had reservations.  After the judge had an off-the-record discussion with the parents about those reservations,[4] the judge stated that it was "clear" that the case was settled.  The judge also inquired of the father whether he had felt "pressured" into proceeding with the settlement, to which the father responded in the negative.  The judge accordingly directed the parties to

_____

    [4] The judge described the plaintiffs' reservations as concerning "various things, including the privacy of this information regarding their son because of him being young and having potential, in the future, access to some funds."

finalize their settlement, and he scheduled an approval hearing for October 2, 2015. In the interim, on September 23, 2015, the court entered an order of dismissal nisi "after [the] action was reported settled," directing the parties to file an agreement or stipulation by October 26, 2015.

At the October 2 hearing, the defendant lawyers presented (on behalf of the parents) a petition for approval of the settlement agreement pursuant to G. L. c. 231, § 140C 1/2.[5] Prior to the settlement judge addressing the petition, however, the parents, through the defendant lawyers, requested to be seen at sidebar, where the parents attempted to reverse course on the settlement because they were concerned the settlement amount did not properly account for the costs of the child's future prosthetics. After further discussion, the judge stated that the parents were not in a position to disavow the settlement, noting that "[t]he case is completely settled as of now for six million." Although the parties reported that they had some additional details to work out, the judge approved the settlement structure (and those settlement details already agreed to) and ordered the parties to appear for another

---

[5] That statute provides, in part, that "[t]he trial court may review and approve a settlement for damages because of personal injury to a minor . . . in any case before the court where any party has filed a petition for settlement approval signed by all parties." G. L. c. 231, § 140C 1/2.

approval hearing to address those aspects that remained outstanding.

The parties appeared for a third hearing on October 22, 2015. At that time, however, the parents (in a pleading signed by the defendant lawyers) filed a motion to vacate the September 23 order of dismissal nisi and to void the settlement agreement. The motion to vacate made two arguments: (1) that the settlement amount failed to properly consider the costs of the child's future prosthetics needs, and (2) that the parents had entered the agreement under duress, due to their fear that a guardian ad litem would be appointed to evaluate the settlement on their child's behalf. The settlement judge held a hearing, but took no sworn testimony or other evidence.[6] He thereafter rejected the parents' arguments, denied their motion, and stated on the record that he believed the settlement amount accounted for the future costs of prosthetics and that the parents were not under duress when they entered into the settlement. The judge then reviewed the remaining aspects of the settlement structure and approved the settlement, stating that the settlement was "favorable" and "just."[7] The parents did not

---

[6] The parents' motion, however, did contain a letter from a prosthetist containing a "rough estimate" of purported costs for the child's future prosthetics.

[7] During a sidebar conversation with the parents, the judge explained that, in his experience, similar cases did not result

appeal from the approval and, on October 26, 2015, signed the final settlement agreement and release on behalf of themselves and the child. The settlement monies were paid out between October and November 2015.

2. The legal malpractice lawsuit. Just shy of three years later, in August of 2018, the plaintiffs commenced this malpractice lawsuit against the defendant lawyers, alleging (1) that the settlement amount was inadequate in that it did not consider the child's future need for and costs of prosthetics, and (2) that the defendant lawyers had caused them to settle under duress, by informing them that the hospital defendants were considering seeking appointment of a guardian ad litem.

The defendants moved for summary judgment, making three arguments in particular. First, they argued that the plaintiffs were collaterally estopped from attacking the adequacy and voluntariness of the settlement agreement, because the settlement judge had considered and ruled on those issues in approving the settlement. Second, they argued that judicial estoppel barred the parents' claims, where the parents had represented to the judge that they entered the medical

---

in awards higher than $6 million. He also cautioned that the parents risked a lower recovery due to the limits on the hospital defendants' insurance coverage -- meaning that the parents would need to prove multiple doctors were at fault to collect more than $6 million, which (in the judge's view) was far from a guarantee.

malpractice settlement free from duress and considered the settlement to be in their child's best interests. Finally, the defendants argued that the plaintiffs had failed to present competent evidence regarding damages, and in particular, that the proffered opinion of the plaintiffs' damages expert was speculative, and insufficient in law to give rise to an issue of material fact as to whether the plaintiffs should have recovered more than $6 million.

The motion judge denied the motion in a margin endorsement. The judge stated that she was not persuaded that either collateral or judicial estoppel applied under the circumstances. Her ruling, however, did not specifically address the defendants' arguments concerning the lack of evidence of damages.

Discussion. Before us the defendants press the same three arguments -- collateral estoppel, judicial estoppel, and the failure to adduce competent evidence of damages.[8] We address

---

[8] The plaintiffs argue that this appeal should be dismissed, because the "the Single Justice did not reference or cite to any serious and/or irreparable consequence(s)" justifying an interlocutory appeal. We are not persuaded that the single justice had such a duty. It is well established that "[t]he single justice 'enjoys broad discretion . . . to report the request for relief to the appropriate appellate court.'" Ashford v. Massachusetts Bay Transp. Auth., 421 Mass. 563, 566 (1995), quoting Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 614 (1980). Indeed, the Supreme Judicial Court has held that a single justice of this court has "the authority to allow appellate review of the denial of [a] motion for summary

each argument in turn, applying the de novo standard of review. See <u>Lynch</u> v. <u>Crawford</u>, 483 Mass. 631, 641 (2019) ("We review an order granting or denying summary judgment de novo . . .").

1. <u>Collateral estoppel</u>. The thrust of the defendants' collateral estoppel argument is that in ruling on the § 140C 1/2 motion and approving the settlement, the settlement judge made factual findings that preclude the plaintiffs' legal malpractice claim, to wit, (1) that the settlement amount was reasonable, and (2) that the plaintiffs were not under duress. We do not agree that collateral estoppel applies here.

In general, collateral estoppel applies where the following requisites are met: (1) "there was a final judgment on the merits in the prior adjudication"; (2) "the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication"; (3) "the issue in the prior adjudication was identical to the issue in the current adjudication"; and (4) the issue "was essential to the earlier judgment, and was actually litigated in the prior action" (quotation and citation omitted). <u>DeGiacomo</u> v. <u>Quincy</u>, 476

---

judgment" where the single justice "concluded that an appeal on this single issue would facilitate the administration of justice." <u>Swift</u> v. <u>American Mut. Ins. Co. of Boston</u>, 399 Mass. 373, 375 n.5 (1987). The single justice accordingly had discretion as to whether to allow the appeal, see <u>McHoul</u> v. <u>Commonwealth</u>, 365 Mass. 465, 468 (1974), and here we discern no abuse of discretion.

Mass. 38, 42 (2016).  For an issue to be actually litigated and essential to the judgment, "[t]he nonmoving party previously must have had a full and fair opportunity to litigate the issue."  Mullins v. Corcoran, 488 Mass. 275, 282 (2021).

While in this case one might question whether any of the above requisites were met, here we will focus on two -- the lack of identity of issues, and the lack of a full and fair opportunity to litigate the issue previously.  As to each of these elements, our reasoning is influenced by the unusual nature of the prior proceeding that is claimed to have preclusive effect -- a motion under § 140C 1/2 to approve a medical malpractice settlement.  A proceeding under § 140C 1/2 is an ancillary proceeding to a personal injury damages claim, specifically designed for the circumstance where the plaintiff is a minor and thus represented by a guardian, usually the parents.  See Mass. R. Civ. P. 17 (b), as appearing in 454 Mass. 1402 (2009) ("If an infant . . . does not have a duly appointed representative, he may sue by his next friend or by a guardian ad litem").  See also Sharon v. Newton, 437 Mass. 99, 107 (2002) (minors may disaffirm most contracts before reaching eighteen years of age or within reasonable time thereafter).  General Laws c. 231, § 140C 1/2, provides:

> "The trial court may review and approve a settlement for
> damages because of personal injury to a minor . . . in any
> case before the court where any party has filed a petition

for settlement approval signed by all parties. The trial court may make such orders and take such action as it deems necessary to effectuate the disposition of a settlement approval including . . . the appointment of a guardian . . . or the holding of an evidentiary hearing."

The statute thus provides that the proceeding can be invoked by a "party," after which the judge "may review and approve a settlement." G. L. c. 231, § 140C 1/2. The primary purpose of the statute is to ensure the settlement is fair to the child -- including, significantly, whether the parents have acted in the child's best interests. Thus, the Supreme Judicial Court has cited "the types of conflicts and financial pressures that may arise in the postinjury settlement context," which "can create the potential for parental action contrary to the child's ultimate best interests." Sharon, 437 Mass. at 109 n.10.[9] Secondarily, the statute provides a measure of protection to the parents, who can secure review and approval from a knowledgeable neutral. See id. And, arguably, § 140C 1/2 can benefit the

---

[9] Although there is not much discussion of § 140C 1/2 in our cases or in the legislative history, courts in other jurisdictions have acknowledged that similar rationales drive their own rules about judicial approval of settlement agreements involving minors. See, e.g., Hojnowski v. Vans Skate Park, 187 N.J. 323, 334 (2006) ("a minor's parent . . . may not dispose of a minor's existing cause of action without statutory or judicial approval" so as "to guard a minor against an improvident compromise [and] to secure the minor against dissipation of the proceeds" [quotation and citation omitted]); Whitcomb v. Dancer, 140 Vt. 580, 586 (1982) (Vermont's statute "imposes an affirmative obligation on the superior court judge to protect the best interests of the minor" and protect the "minor child . . . from the potential improvidence of his or her parents").

original defendants, by protecting them in "any later action by or on behalf of the child."  Cf. Dominique v. Ralph D. Kaiser Co., 479 A.2d 319, 325 n.3 (D.C. 1984) (Terry, J., concurring).

Given its purposes, we think that approval under the statute at most will have preclusive effect as to the settlement parties it was intended to protect -- the child, the parents, and perhaps, the original defendants.  But there is nothing in § 140C 1/2, or in any case law addressing analogous statutes, that indicates that the judicial approval process was intended to protect the child's lawyers.  Here, the settlement judge did not make any findings regarding the services the defendant lawyers provided, nor is there any suggestion in the statute that such is required.[10]  Moreover, as this case illustrates, the approval procedure may be relatively informal, in which case the settlement judge is dependent, to some extent, on the presentation of the child's lawyers as to the facts that bear on

---

[10] Approval under § 140C 1/2 thus differs from approval of class-action settlements under Fed. R. Civ. P. 23 (2018) (rule 23).  The defendants argue by analogy that we should apply collateral estoppel here because some Federal courts have held that class-action settlements approved under rule 23 cannot be collaterally attacked through subsequent legal malpractice claims.  We do not find the analogy persuasive, however, because approval under rule 23 requires something that § 140C 1/2 does not -- an express determination that counsel adequately represented the interests of the class.  See Laskey v. International Union, United Automotive, Aerospace and Agric. Implement Workers, 638 F.2d 954, 957 (6th Cir. 1981) ("finding that the class was adequately represented is necessary for finding the settlement was fair and reasonable").

the strength and value of the child's claim.  In this case, at least, the issue addressed at the settlement approval hearing was whether the settlement was reasonable in structure and amount as to the child and the parents, based upon what was known of the facts and law, and under an implicit assumption that the defendant lawyers worked the case to professional standards.  By definition, that issue is not identical to the issue presented in this legal malpractice case.

For many of the same reasons, we do not believe the issue of the reasonableness of the settlement was "full[y] and fair[ly]" litigated for purposes of this claim against the defendant lawyers.  See Mullins, 488 Mass. at 282.  As noted above, the settlement judge did not take evidence regarding the plaintiffs' possible damages.  Nor did he take evidence regarding the investigation the defendant lawyers performed, or how or whether the defendant lawyers evaluated the child's potential lifetime prosthetics costs.  True, the plaintiffs did argue in their motion to vacate the settlement that they entered the agreement not fully understanding the child's future prosthetics needs.  However, it does not follow from the denial of that motion that the judge actually determined that the defendant lawyers properly advised the plaintiffs about those costs, where he took no evidence on the subject.

Our conclusion is consistent with the Supreme Judicial Court's decision in Meyer v. Wagner, 429 Mass. 410 (1999). There, the court addressed a client's legal malpractice claim against her former divorce attorney. See id. at 411. The crux of the client's claim was that the attorney failed to (1) competently prepare and execute a settlement agreement, and (2) institute ancillary proceedings to secure certain assets, causing her to obtain less than her fair share of the marital assets. See id. As here, the settlement agreement at issue had been approved by a judge as "fair" and incorporated into the underlying judgment. Id. at 414. The attorney argued that the client's acceptance of the agreement and its approval barred the subsequent malpractice claim. See id. at 416. The lower court struck the malpractice claim, but the Supreme Judicial Court reversed. See id. at 412, 425. The court declined to depart from "the usual malpractice rule on settlements" just because a judge had approved the agreement. Id. at 419, citing Grayson v. Wofsey, Rosen, Kweskin & Kuriansky, 231 Conn. 168, 175 (1994). The court accordingly held that

> "where a client establishes that his or her attorney, in advising on the settlement of a divorce action, has failed to exercise the degree of skill and care of the average qualified lawyer, and that the failure has resulted in loss or damage to the client, the client is entitled to recover even if the settlement has received judicial approval" (emphasis added).

Meyer, supra at 419.  Consistent with Meyer, we will not apply collateral estoppel under the circumstances here.[11]

2.  Judicial estoppel.  The defendants next argue that the parents are judicially estopped from attacking the settlement, due to the parents' initial representations to the settlement judge that the amount was adequate and that they had entered the agreement voluntarily.  The doctrine of judicial estoppel generally arises where a party makes a representation or advances a contention to a court in one proceeding, achieves success as a result of the representation, and then, in a subsequent proceeding, asserts a contradictory contention.  See Otis v. Arbella Mut. Ins. Co., 443 Mass. 634, 641 (2005).  The doctrine's purpose is to prevent "parties from improperly manipulating the machinery of the judicial system" -- i.e., "playing fast and loose with the courts" (citation omitted).

---

[11] Separately, the finding that the plaintiffs were not under duress when they signed the settlement agreement does not preclude the plaintiffs' legal malpractice claim, at least insofar as the claim asserts that the settlement amount was unreasonable because the defendant lawyers failed to properly investigate the costs of future prosthetics.  That aspect of the plaintiffs' legal malpractice claim does not turn on whether they were under duress.  See Fishman v. Brooks, 396 Mass. 643, 646 (1986) ("an attorney is liable for negligently causing a client to settle a claim for an amount below what a properly represented client would have accepted").  Insofar as the plaintiffs' legal malpractice claim seeks recovery based upon the alleged duress, rather than a failure to investigate, the collateral estoppel issue presented would be different; however, in light of our decision on damages infra, we need not decide that question.

Id. at 642.  To that end, there are "two fundamental elements" that warrant judicial estoppel:  "[f]irst, the position being asserted in the litigation must be 'directly inconsistent,' meaning 'mutually exclusive' of, the position asserted in a prior proceeding" (citation omitted), and "[s]econd, the party must have succeeded in convincing the court to accept its prior position."  Id. at 640-641.

It should be evident that the elements of judicial estoppel are not present here.  Although in the § 140C 1/2 proceeding the parents initially represented that they were satisfied with the settlement, they expressed their reservations almost immediately thereafter.  Rather than seeking to gain a benefit from their initial representations to the settlement judge, the parents actively sought to withdraw those representations and to undo the settlement.  They filed a motion to that effect before the § 140C 1/2 process was complete, arguing specifically that the settlement did not adequately consider the future costs of prosthetics for their child.  The parents' ultimate position in the medical malpractice action therefore was not directly at odds with, but consistent with, their position here.  Nor did the parents actually succeed in convincing the judge to accept their positions on the settlement -- that is, final approval of the settlement occurred in spite of the parents' expressed concerns.  Put differently, there is no indication that the

plaintiffs engaged in the type of "playing fast and loose with the courts" or manipulation of the judicial system that judicial estoppel is designed to prevent. Otis, 443 Mass. at 642.

3. Evidence of damages. The defendants fare better with their third argument, however, which is that the plaintiffs failed to put forward competent evidence of damages -- that is, the plaintiffs failed to present admissible evidence that they would have obtained a settlement or recovery in excess of $6 million had the defendant lawyers performed to professional standards. Proof of damages, of course, is an essential element of the plaintiffs' malpractice claim. See Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C., 25 Mass. App. Ct. 107, 111 (1987). Here, the only evidence of damages the plaintiffs produced was the purported expert disclosure of David Oliveira, an experienced medical malpractice attorney. The entirety of his purported opinion about the value of the medical malpractice action, and its basis, was as follows:

> "The realistic case value for this matter is in excess of $10 million. This would have included future equipment and medical costs, loss of consortium and, of equal importance, [the child's] pain and suffering over many years (past and future). The pain and suffering alone could have been worth $3-$4 million given that the higher number is merely $1000/week for an 80-year life expectancy."

Thereafter, in response to the defendants' summary judgment motion, the plaintiffs submitted a supplemental affidavit from Oliveira, in which he stated that he had since "confirmed" his

prior opinion by researching "verdicts and settlements in the Commonwealth for a variety of cases, including medical malpractice cases involving amputations." Notably, the supplemental affidavit did not identify any specific settlements or verdicts, nor provide a methodology for how those settlements and verdicts supported his $10 million opinion.

The defendants are correct that the plaintiffs' damages submissions were insufficient to survive summary judgment. Our conclusion is rooted in rule 56 (e), which provides that affidavits supporting or opposing summary judgment "shall set forth such facts as would be admissible in evidence." Accordingly, if a party moving for summary judgment properly supports their motion, "an adverse party may not rest upon the mere allegations or denials of his pleading"; instead, the adverse party must -- "by affidavits or as otherwise provided" under rule 56 -- "set forth specific facts showing that there is a genuine issue for trial." Mass. R. Civ. P. 56 (e). See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

Here, the plaintiffs' submission did not "set forth such facts as would be admissible in evidence," not just as a matter of form, but as a matter of substance. Mass. R. Civ. P. 56 (e). Admissibility of expert testimony at trial is governed by Commonwealth v. Lanigan, 419 Mass. 15 (1994), and its progeny.

Under that case law, judges have a "gatekeeping" role in the admission of expert testimony of all types.  See Canavan's Case, 432 Mass. 304, 313 (2000).  A proponent of expert testimony must show (among other things) both (1) that the proposed expert testimony is based upon a reliable methodology, and (2) that that methodology has been reliably applied to the facts of the case.  See Commonwealth v. Barbosa, 457 Mass. 773, 783 (2010), cert. denied, 563 U.S. 990 (2011).  See also Lanigan, supra at 26; Smith v. Bell Atl., 63 Mass. App. Ct. 702, 719-720 (2005); Mass. G. Evid. § 702(d) (2022).  In the past, this court has applied the Lanigan standard at the summary judgment stage to conclude that a particular expert proffer was, as a matter of law, not admissible.  See, e.g., Grassi Design Group, Inc. v. Bank of Am., N.A., 74 Mass. App. Ct. 456, 462-463 (2009); Baptiste v. Sheriff of Bristol County, 35 Mass. App. Ct. 119, 126 (1993).  Cf. Molly A. v. Commissioner of the Dep't of Mental Retardation, 69 Mass. App. Ct. 267, 284 n.24 (2007) (noting that, if made, Lanigan challenge to expert evidence at summary judgment "might have succeeded . . . because [the expert evidence] largely failed to satisfy the requirements of" rule 56 [e]).

Here Oliveira's expert disclosure and supplemental affidavit failed to meet the basic standard for admissibility under the case law, because they did not set forth how Oliveira

had applied a reliable methodology to the facts of this case.[12] Put differently, Oliveira's disclosure and affidavit seem to be saying that for a medical malpractice claim of this type, with injuries of this type, previous settlements and verdicts demonstrate a likely value of $10 million or more. Assuming that Oliveira described a valid methodology for valuing cases, however -- that is, analyzing verdicts and settlements of cases with comparable facts -- that methodology still must be reliably applied. See Lanigan, 419 Mass. at 26. See also Commonwealth v. Patterson, 445 Mass. 626, 648 (2005) ("Judges . . . need not admit . . . every application of a . . . method . . . merely because another application of the method has been deemed reliable"). And here, nothing in either Oliveira's expert disclosure or his supplemental affidavit describes how his methodology was applied. He does not explain, for example, which verdicts and settlements he reviewed, what the amounts of those verdicts and settlements were, or why those upon which he based his opinion were apt comparators. Cf. Santos v. Chrysler Corp., 430 Mass. 198, 206 (1999) (expert's opinion properly excluded where proponent did not establish that data underlying the opinion "matched the circumstances of the plaintiff's accident"). Simply setting forth an expert's experience, and

_____

[12] We do not here question whether Oliveira had sufficient qualifications to determine the value of the plaintiffs' case.

that he did some research, is not sufficient when the expert's
application of his methodology to the facts is not disclosed.[13]
See Commonwealth v. Franceschi, 94 Mass. App. Ct. 602, 610
(2018) (proponent did not show that expert "reliably applied a
reliable method").  In short, how Oliveira arrived at his
opinion was "ill described," rendering it "invalid and
unreliable."  Hicks v. Brox Indus., 47 Mass. App. Ct. 103, 107
(1999) (expert opinion insufficient to warrant reconsideration
of summary judgment).[14]

In their brief, the plaintiffs argue that a Lanigan
gatekeeper analysis does not apply to summary judgment motions
-- that it applies only when "trial [is] imminent."  To the
extent the plaintiffs are arguing that at summary judgment
judges cannot determine a proffered expert opinion to be without
evidentiary value, they are incorrect.  As noted, rule 56 (e)
requires plaintiffs to proffer facts that would be admissible in

---

[13] The disclosure's cursory reference to pain and suffering damages is equally deficient.  Oliveira does not cite any factual basis for opining as to the value of the pain and suffering claim.

[14] We do not hold that judges must conduct Lanigan hearings at the summary judgment stage whenever a party challenges an opponent's expert report (although we do not rule out using such a process, in the judge's discretion).  We hold no more than when a party seeks to meet their summary judgment burden by relying on expert affidavits, reports, or disclosures, those materials must meet rule 56 (e)'s requirement that they set forth sufficient grounds to establish that the opinion "would be admissible in evidence."

evidence. This requirement applies to proffered expert opinions as well, as numerous cases have held, from this court and the Federal courts. See Grassi Design Group, Inc., 74 Mass. App. Ct. at 462-463 (affirming summary judgment to defendants where plaintiff's reports did "not qualify as expert opinions under [Lanigan] and . . . [we]re insufficient to create a genuine issue of material fact"); Baptiste, 35 Mass. App. Ct. at 126 (no error in "disregard[ing] the affidavit from the plaintiff's expert" in granting defendants' motion for summary judgment where "many of the expert's statements [we]re based upon assumptions proved faulty by the undisputed facts" and "would not be admissible at any trial").[15] Rule 56 does not contain an exception for expert evidence, nor should it. Because the plaintiffs did not proffer admissible evidence on damages, summary judgment should have entered for the defendants.

---

[15] See also, e.g., Equal Employment Opportunity Comm'n v. Freeman, 778 F.3d 463, 465-468 (4th Cir. 2015) (affirming summary judgment where plaintiff's expert's opinion was excluded as unreliable, leaving plaintiff without evidence sufficient to establish prima facie case); Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998) (expert evidence correctly excluded because "[o]n a summary judgment motion, the district court properly considers only evidence that would be admissible at trial"); Salas v. Carpenter, 980 F.2d 299, 305 (5th Cir. 1992) (reversing denial of defendant's motion for summary judgment, noting that plaintiff's expert's summary judgment affidavit contained "conclusory assertions" that were inadmissible and could not "be relied upon by plaintiffs to prevent summary judgment").

*Order denying motion for*
*summary judgment reversed*.

MILKEY, J. (concurring).  I join the majority's opinion in all respects, including its ruling that the plaintiffs did not address the damages issue in a manner sufficient to survive summary judgment.  In my view, this is a correct, if strict, application of what Mass. R. Civ. P. 56, 365 Mass. 824 (1974), requires.  I write separately merely to highlight my sense that the strictness we apply may be a bit out of step with the somewhat more lenient summary judgment culture prevalent in the trial courts.  In this respect, I note that we do not typically review orders denying motions for summary judgment in light of their interlocutory nature, and we performed such review here only because a single justice had allowed it.  The bar, especially the plaintiffs' bar, would be wise to view today's opinion as presenting a cautionary tale.